IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS


MILO A. JONES,
                    Plaintiff,


          v.                        CASE NO.  11-3082-SAC

RAY ROBERTS,
et al.,
                    Defendants.


<u>MEMORANDUM AND ORDER</u>

     This case filed by an inmate under 42 U.S.C. § 1983 comes

before the Court on Defendants' Motion to Dismiss or in the

Alternative for Summary Judgment (Doc. 25).  Plaintiff seeks

damages and declaratory judgment based upon prison conditions

that include his extended confinement in administrative

segregation (ad seg).  He asserts violations of his Fifth and

Eighth Amendment rights applicable through the Fourteenth

Amendment.  Defendants are two employees of the Kansas

Department of Corrections (KDOC): Ray Roberts as former Warden

of the El Dorado Correctional Facility, El Dorado, Kansas (EDCF)

and Susan Gibreal as Deputy Warden of EDCF.  The court finds

that Plaintiff has not set forth specific facts showing a

genuine issue for trial as to his claims that he had a liberty

interest in avoiding confinement in ad seg at the EDCF and that

he was denied due process.  Accordingly, Defendants' motion for

summary judgment is sustained.

# I. SUMMARY JUDGMENT STANDARD

The court has considered documents and affidavits attached to the Martinez Report and the pleadings of both parties, many of which are duplicates. Consequently, this motion is resolved as one for summary judgment.[1] The Tenth Circuit has succinctly set forth the standards for determining a summary judgment motion:

> Summary judgment should be granted 'if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.'" Martinez v. Beggs, 563 F.3d 1082, 1088 (10th Cir. 2009)(quoting Fed.R.Civ.P. 56(c)), cert. denied, --- U.S. ----, 130 S.Ct. 259, 175 L.Ed.2d 131 (2009). "When applying this standard, we examine the factual record in the light most favorable to the party opposing summary judgment." Belhomme v. Widnall, 127 F.3d 1214, 1216 (10th Cir. 1997). The moving party has "both the initial burden of production on a motion for summary judgment and the burden of establishing that summary judgment is appropriate as a matter of law." Trainor v. Apollo Metal Specialties, Inc., 318 F.3d 976, 979 (10th Cir. 2003). "[T]he movant need not negate the non-movant's claim, but need only point to an absence of evidence to support the non-movant's claim." Sigmon v. CommunityCare HMO, Inc., 234 F.3d 1121, 1125 (10th Cir. 2000). "If the movant carries this initial burden, the nonmovant may not rest on its pleadings, but must bring forward specific facts showing a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." Jenkins, 81 F.3d at 990.

*Kannady v. City of Kiowa*, 590 F.3d 1161, 1168-69 (10th Cir.

---

[1]     Plaintiff is aware of the rules regarding summary judgment motions from two prior cases. *See Jones v. Courtney*, 04-3255-JWL (Nov. 13, 2006); *Jones v. Bokor*, 08-3288-JAR (Jan. 24, 2011)(in this action Mr. Jones filed a pro se 42-page response to defendants' motion to dismiss that included his facts in "response to movant's statement of uncontroverted facts.")(Doc. 179).

2010).  A verified complaint stating facts admissible at trial and based on personal knowledge has the same force and effect as an affidavit for the purpose of responding to a motion for summary judgment.  *See Conaway v. Smith*, 853 F.2d 789, 792 (10th Cir. 1988).  In examining the underlying facts, the Court may not make credibility determinations or weigh the evidence. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  Finally, summary judgment is not a "disfavored procedural shortcut."  On the contrary, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986)(quoting Fed.R.Civ.P. 1).

## II. UNCONTROVERTED FACTS

Mr. Jones has filed a verified complaint, (Doc. 6) an Objection to the Martinez Report (Doc. 23), an Objection to Defendants' motion for summary judgment (Doc. 27), and an Affidavit in support of the latter Objection (Doc. 28). Although the Martinez Report (Doc. 22) has been considered, the court has not relied upon it to the extent it asserts any material, disputed facts.[2]  The following facts are either

---

[2]    See *Hall v. Bellmon*, 935 F.2d 1106, 1109 (10th Cir. 1991)(the purpose of a Martinez report is to develop a record sufficient to ascertain whether there are factual or legal bases for Plaintiff's claims; and the report is to be treated like an affidavit, although the court may not use it to resolve material, disputed facts.)

uncontroverted or taken in the light most favorable to Plaintiff.

Plaintiff Milo A. Jones is serving sentences for multiple offenses including aggravated robbery, robbery, and criminal damage to property for which he was sentenced in 1999. In 1992, he was sentenced for aggravated escape from custody. In 1994 and in 1995 he was paroled and later absconded. Martinez Report Attachments, Doc. 22-2 at 2-3. At all times relevant to this complaint, Mr. Jones was an inmate in the custody of the KDOC and was incarcerated at the EDCF[3] where Defendants were employees.

In 2007, the following events took place. In May, after Mr. Jones had been on Intensive Supervision Placement (ISP) "for unrelated matters" and had successfully completed the Intensive Management Unit (IMU), he was released to general population (gen pop). On July 31 Jones received a Disciplinary Report (DR) charging him with dangerous contraband and disruptive behavior, which violated his ISP. See Doc. 22-1 at 1. He was served the DR (Doc. 22-1 at 6) and placed in ad seg on prehearing detention (PHD). An Administrative Segregation Report issued the same date provided the reasons for Plaintiff's segregation and PHD status including the seriousness of the misconduct and that the

---

[3] Plaintiff was confined in ad seg at the Lansing Correctional Facility (LCF) from August 7 through October 9, 2007. This time period is outside the statute of limitations.

placement was "necessary to preserve the safety and security of the (EDCF)." See Amended Complaint Attachments, Doc. 6-1 at 36. Jones received a copy of this report on August 3.[4]  *Id.*  On August 7 Mr. Jones was transferred to Lansing Correctional Facility (LCF) to attend court.  While there, on September 13 he received another DR.  A nurse at LCF reported that while administering medication she observed Jones standing naked with his penis sticking through bars. *Jones v. McKune*, 232 P.3d 887, *1 (Kan.App. 2010)(Table).  He was charged with committing lewd act, and transferred from ad seg to "More Restricted Area." Docs. 22-3 at 1, 22-5 at 2.  He was found guilty and fined $15.[5] On October 9 Mr. Jones was returned to EDCF, placed in ad seg,

---

[4]    In its order screening Plaintiff's Amended Complaint, the court dismissed "all plaintiff's claims based upon acts or omissions that occurred prior to April 18, 2009" as barred by the applicable statute of limitations. Yet, Mr. Jones continues to assert time-barred claims.  Plaintiff's time-barred claims that have already been dismissed and will not be considered further herein include, but are not limited to, any claim that Plaintiff was not afforded proper notice, hearings, or other due process in connection with his initial placement in ad seg on PHD status in July 2007, his classification as OSR shortly thereafter, and any disciplinary proceedings prior to April 18, 2009.

[5]    Jones filed a 60-1501 petition in Butler County District Court claiming among other things that the hearing officer's denial of his witness request violated due process.    *Jones v. McKune*, 197 P.3d 906 (Kan.App. 2008)(unpublished).  The KCA affirmed that the evidence was sufficient to support Jones' conviction, but concluded that the denial of his witness request may have violated procedural due process.  On remand, the district court dismissed the action after Jones failed to provide the name of the witness for a new hearing.  On second appeal, the KCA again reversed and remanded, finding the district court failed to follow its mandate to require an answer from defendant and allow Jones to reply in order to determine if procedural due process was violated. *Jones v.* McKune, 232 P.3d 887 (Kan.App. June 25, 2010)(unpublished).  On October 29, 2010, the district court entered an order finding that Jones had been denied a witness, and there was no record of the reason.  The court held it had "no choice but to reluctantly conclude that petitioner's due process rights were technically violated." Doc. 22-4 at 4.  The disciplinary conviction was vacated and stricken from petitioner's record.

and continued on PHD status. See Doc. 6-1 at 7 (Review dated Nov. 3, 2008). On October 12 the dangerous contraband and disruptive behavior DR was "dropped" because papers had been misplaced and time limits expired.[6] The Administrative Segregation Review (Review) of October 24 indicated Plaintiff's segregation status was being changed to Other Security Risk (OSR). Doc. 6-1 at 11, 37. The Review provided "Reason(s) and Fact(s)" including that

> Jones' segregation status is being changed from PHD to OSR . . . . On 7/31/07, inmate Jones was residing in CCH on the Intensive Supervision program when staff suspected him of having dangerous contraband in his possession. When staff responded to inmate Jones' cell, he kicked a tattoo gun from his cell onto the run in an effort to conceal it. After inmate Jones had been restrained and taken to the shower to allow officers the opportunity to thoroughly search his cell, he became highly disruptive by picking up the shower chair and throwing it against the shower door. It should also be noted that while out to court at LCF on 9/21/07, inmate Jones was convicted of a Disciplinary Report for Lewd Acts which violates the conditions of his (ISP).

*Id.* The Review further provided that Jones' change in status was "necessary to preserve the safety and security of the (EDCF)." *Id.* Plaintiff exhibits a grievance response, which also informed him that his lewd act DR and conviction were a clear violation of his intensive supervision and the reason he was placed back on OSR. *Id.* at 12. As early as November 19,

---

[6]    Mr. Jones was not aware of this fact until months later. On February 26, 2008, he submitted a grievance seeking to "dismiss" the July 31, 2007 DR. The response informed him that the charges had already been dismissed on October 12, 2007. Doc. 6-1 at 38.

2007, Mr. Jones was advised, in response to another grievance asking how long he would be in ad seg, that he needed to attend seg review. Doc. 6-1 at 3.

In 2008, the following events occurred. The May Review indicated that Jones "[j]ust recently started communicating appropriately with MH." Doc. 6-1 at 6. The Segregation Review Board (SRB) recommended:

> intensive supervision, with admonition that future misconduct will not bode well for him. Inmate has essentially been in (ad seg) for 8 months on 1 Lewd Acts DR. This occurred while on Intensive Supervision after serving approximately 5 years in admin seg for an escape attempt. . . . [T]the Board recommends re-placement in Intensive Supervision to facilitate progress on the part of the inmate to be able to function appropriately in General Population.

On "PMC (Program Management Committee) Review" Defendant Gibreal disapproved the recommendation, but stated she was willing to reconsider in 6 months. PMC Member D. Coellner disapproved finding that Jones needed to remain DR free and work with Mental Health (MH), but expressed his willingness to consider BMP in 6 months. PMC Member Roberts also disapproved, finding "placement facts remain." *Id.* At the October 6 Review the SRB and the PMC members all voted to retain. The SRB reasons were: "retain until November; recommend BMP at that time." Doc. 6-1 at 9. PMC Member Coellner commented that Jones "[n]eeds to be DR free at least one year." PMC Member Gibreal commented: "Long history of recalcitrant behavior resulting in seg placement. Recommend

he develop a long term plan for successful transition into GP for seg review and PMC to consider." *Id.* In a Form 9 grievance dated October 15, Plaintiff asked why he was being retained in ad seg. Doc. 6-1 at 8. Coellner acknowledged that Jones had been DR free for over a year, and responded that the tattoo gun and shower incident a year ago that resulted in revocation of his intensive supervision was the reason for his retention. He advised Jones to remain DR free and keep working with MH. *Id.* The November Review indicates receipt of an e-mail from Coellner stating he was "willing to consider BMP." Doc. 6-1 at 7. All SRB members recommended release with Intensive Supervision. *Id.*

In 2009, at the January Review Jones was informed that Warden Roberts planned to interview him before making any decision. Doc. 22-6 at 1. At the January, February and March Reviews the SRB recommended release but "no change in current status," and noted they were awaiting Roberts' interview and approval or disapproval. On March 27, 2009, Jones was interviewed by Roberts and Gibreal, who asked him about his DR history and goals. He explained that his goals were to maintain good behavior, have family contact and stay out of ad seg. Defendants advised Jones that they would check into his claim that he had been found not guilty of the lewd act DR, which was still showing as active. The April 13, 2009 Review (Doc. 6-1 at 10; Doc. 22-6 at 4) noted Mr. Jones' interview with Warden

Roberts on March 27, and that the SRB was still "waiting on approval/disapproval from Warden Roberts." All SRB members recommended release, but again commented "no change in current status." On PMC Review, all members recommended retention. Coellner commented "needs to continue to work with unit team." Gibreal commented "history of involvement in escapes and escape attempts," and Roberts concurred.[7] This report shows Jones' continued status on OSR. *Id.*

All the above events occurred more than two years before Mr. Jones filed this action. It follows that Plaintiff cannot recover in this civil rights action based upon those events.[8]

On April 20 Mr. Jones submitted an Inmate Request to Staff Member Roberts. Doc. 6-1 at 13. Roberts responded:

> In order for me to ascertain how suitable you are for general population, I must understand your motivation for involvement in the activities you were involved in which caused you to be placed in segregation. You say you have done nothing. This gives me nothing.

---

[7]     Plaintiff also alleged that at a meeting with both defendants, he was asked about the incident for which he was placed in ad seg at EDCF in 2000, and responded that the reasons for that placement were "never substantiated" and no hearing was provided. When asked to explain his involvement, Plaintiff stated that he never made any attempt to escape or received a DR conviction on any new charges of escape attempt, and was "at his domicile when the officer came and transported" him to ad seg. In a grievance appeal exhibited by Plaintiff, he stated that he had spent six years in ad seg based on this incident. Doc. 6-1, at 29. Roberts also asked Plaintiff about an October 2008 incident where two other inmates had escaped from EDCF. Plaintiff stated that a full investigation had been conducted, he was not implicated, and he had nothing to do with this incident. Plaintiff notes that none of his 2008 Reviews referred to this incident.

[8]     On the other hand, prison officials were not precluded from considering these events as background information in determining Mr. Jones security status.

9

*Id.*; Doc. 22-8 at 1.  On April 21, Jones submitted an Inmate Request to Staff Member Gibreal.  Doc. 22-8 at 2.  She responded:

> We don't feel comfortable letting you out at this time because of your escape history information period. There is evidence indicating your involvement yet you state you weren't involved in an escape attempt and potentially that of another inmate.

*Id.*  The May Review reported that Jones "had several conversations with Warden Roberts and was advised that he was not approved for release from segregation."  Doc. 22-6 at 5. Jones declined participation.  All SRB members voted to retain and commented "no change in current status."  *id.*  On May 29 plaintiff was again informed in a grievance response that if he wished to work his way out of seg "it's strongly suggested you attend monthly segregation review board."  Doc. 6-1 at 23.  At the June Review, Jones declined participation.  Doc. 22-6 at 6. The report noted a recent DR for urinating in the exercise yard. SRB members voted to retain.  The July Review noted that "DW has agreed to dismiss DR due to not meeting the elements of the offense."  Doc. 22-6 at 7.  Again, Jones declined participation, as he did at the August Review, and the SRB voted to retain. *Id.* at 7-8.  On August 11 plaintiff was again informed that if he wished to get his placement changed, he needed to attend monthly seg reviews.  Doc. 6-1 at 51.  Jones attended his September Review.  The vote was "Retain" with comments that

"[p]lacement facts apply." Doc. 22-6 at 9. Jones attended his October Review, and the SRB and the PMC members voted to retain. Doc. 22-6 at 11-12. Jones attended his November Review, and it appears that the status of his lewd act DR was discussed. The SRB voted to retain, reasoning that "placement facts apply." Doc. 22-6 at 13-14. On December 4, 2009, plaintiff received a DR charging him with "Dangerous Contraband Class I." Doc. 22-9 at 1. He pled guilty to the charge. *Id*. at 5. Jones declined participation in his December 14 Review. Doc. 22-6 at 15. His "DR for Dangerous Contraband (hooch)" was noted, and the vote was to retain. *Id.*

In 2010, Jones attended his January Review but did not attend in February, March, April or May. The SRB and the PMC members voted to retain. Doc. 22-6 at 18, 19. PMC member Snyder recommended that Jones "participate in segregation review to establish goals for release." *Id.* at 21-23. The June Review indicated that Jones was "moved from BCH to ACH," and the vote was to retain. *Id.* at 24. At his July Review, Jones commented: "I'm trying to get out of seg. I didn't know they were going to escape." *Id.* at 26. The vote was to retain. At his August Review, Jones declined participation, and the recommendation was to retain. *Id.* at 28. At the September 3, 2010 Review, the SRB recommended release and stated its reasons:

Inmate has demonstrated his ability to remain DR free

> for 9 months and has maintained a positive attitude.
> Inmate has remained quiet and is respectful toward
> staff. Admin Seg review board is supportive of
> inmate's recommendation to be approved for the BMP
> program.

Doc. 22-7 at 2. Jones' behavior summary included "has communicated well with unit staff" and "very quiet." PMC member Snyder recommended release with BMP, and member Heimgartner recommended release, commenting that "I/M has a DR for 12/4/09 for homemade alcohol" but with BMP "can still reach 12 month DR free, if he continues with current behavior." Defendant Roberts concurred. On October 29, 2010, the Butler County District Court filed its order overturning Plaintiff's lewd act misconduct conviction "that violated his ISP." Doc. 22-4 at 1-2. It was on this date that this particular placement factor no longer existed. At plaintiff's November Review, the behavior summary showed that on October 21, 2010, Jones was "moved to CCH, approved for BMP," and had satisfactory behavior "since arriving at CCH." Jones attended and commented that he was "just trying to get out of segregation without going through the program." He was reminded that he was "approved for the program and just need(ed) to be patient." The SRB again recommended release reasoning Jones was "approved for BMP and ISP." Doc. 22-7 at 3. Plaintiff attended his December 2010 Review. The votes and comments were the same. Doc. 22-7 at 5-6.

In 2011, Plaintiff attended his January Review and

commented, "all I'm doing is maintaining and staying out of trouble." The Board recommendations and comments were the same. *Id.* at 7-8. At his February Review Jones commented, "I am only here because they said I am supposed to attend segregation review." Recommendations and comments were the same. Id. at 9-10. Plaintiff attended his March Review. His behavior summary included a discussion of "group progress" and showed that Mr. Jones "started step 1 of the program on 3/8/2011." Doc. 22-7 at 11. The SRB continued to recommend release, as did the PMC members, who commented "approved for BMP/ISP and "supportive of BMP placement." *Id.* at 12.

This action was executed by Plaintiff on April 18, 2011.

Plaintiff attended his May Review, where "group progress" and "the upcoming step 2 in June" were discussed. The SRB recommendations were the same. Doc. 22-7 at 13-14. Plaintiff attended his June Review; and it was noted that the "group came out on step 2" on June 7. SRB recommendations were the same. *Id.* at 15-16. Plaintiff attended his July 2011 Review, where it was reported that the "group talked about moving to C1 on August 1st." Doc. 22-7 at 17. Plaintiff attended his August 15 Review, and it was reported that the "group has been in general population for 3 weeks," was "adjusting well," and was attending classes. *Id.* at 19. Plaintiff attended his September Review, and his behavior summary indicated: "Jones is doing a great job

and continues to participate in step 3 programs." *Id*. at 21.

Defendant Roberts has submitted his affidavit, which indicates that he was Warden at the EDCF from July 2003 to January 2011. He recalls that Jones was placed in ad seg in July 2007, and that "early 2009" SGB recommendations were for Jones to be released from ad seg. He also recalls his and Gibreal's March 2009 conversations with Jones regarding his possible release from ad seg, and discussions of Defendants' belief that Jones was involved in an escape or an escape attempt involving another inmate in 2000 and their suspicion of his involvement in a second escape or escape attempt in October 2007. Roberts avers that Jones' responses

> were coy and not responsive to the questions that were
> being asked. He adamantly denied any involvement in
> these escapes/attempted escapes. However, information
> available to the KDOC leads me to believe that he was
> involved in the 2000 escape and may have played a role
> in the 2007 escape. Because I did not believe he was
> candid and did not believe that he was prepared to be
> released to gen pop, I did not concur with the
> decision of the (SRB).

Roberts further avers that Jones was released from ad seg in 2011.

The parties agree that Plaintiff's initial placement in ad seg at EDCF was on July 31, 2007. Defendants' exhibits indicate that Mr. Jones was in gen pop in late July 2011. Thus, the court finds that Mr. Jones was in ad seg at EDCF continuously

for approximately 1460 days or 4 years.[9]

After the court ruled in its initial screening order that Plaintiff failed to state a claim because he had not described conditions in ad seg that were atypical and posed a significant hardship, he alleged in his Amended Complaint that he was subjected to many atypical and significant deprivations while in ad seg.


III.  **DISCUSSION**

Defendants contend as the basis for their dispositive motion that Plaintiff fails to state a claim upon which relief can be granted for two reasons.[10]  First, they assert that no constitutional violation occurred and they are entitled to qualified immunity as a result.  Second, they argue that Plaintiff does "not have a federal due process liberty interest" because his segregation did "not impose an atypical and significant hardship."

Based on their summary of the facts shown by the record, Defendants allege that Plaintiff's disciplinary conviction and classification as OSR show there was a legitimate penological

---

[9]    Plaintiff claimed in his original and amended complaints that he was held in ad seg for 1800 days or 5 years.  He filed this action while still in ad seg on April 18, 2011, which mathematically was less than 3 years and 9 months after July 31, 2007.  He has never provided the date of his release. He has not disputed the release date in the record.

[10]    Defendants cite 28 U.S.C. § 1915(e)(2)(B), which requires the court to dismiss a case at any time it determines that the action fails to state a claim as well as Fed.R.Civ.P. 12(b)(6).

interest in his continued ad seg placement.  Plaintiff does not controvert any of the crucial facts.  Instead, in his responsive filings he "objects" to Defendants' motion based on several grounds.  Most of these grounds are without factual or legal basis.[11]  Plaintiff's objection that he has not had the opportunity to conduct discovery on "defendants' premature motion" is completely conclusory.  He does not show "by affidavit or declaration that, for specified reasons," he cannot present certain essential facts without discovery.  *See* Fed.R.Civ.P. Rule 56(d).  Nor does he even allege facts suggesting how discovery would allow him to present any specific material fact for trial.  Some of Plaintiff's other objections are discussed within the court's analysis that follows.


   **A. Qualified Immunity**

      Defendants assert entitlement to qualified immunity on all

---

[11]    Plaintiff's objection that Defendants filed their dispositive motion "without providing an answer to the complaint" has no legal merit.  Summary judgment motions are routinely and properly filed in lieu of an answer.  For this reason, Plaintiff's Motion for Default Judgment is denied.
      Plaintiff's objection that Defendants have not denied "any of Plaintiff's averments in his complaint" supports the court's finding that no material fact remains for trial.
      Two other objections by Plaintiff, that Defendants' attorney has not filed a proper "motion for an appearance" and that "this document" was "not properly entered into evidence and has no probate value," are not supported by any facts or legal authority and warrant no additional discussion.
      Plaintiff alleges that the SRB recommended his release from ad seg several times between April 2008 and March 27, 2009, and complains that PMC members including Defendants voted for retention.  Not only did these events occur outside the statute of limitations, the disapproval of an SRB recommendation on PMC review does not, without more, show a violation of due process.

16

claims against them in their individual capacity. *See generally Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Pearson v. Callahan*, 555 U.S 223 (2009)(quotation omitted).

> When a defendant pleads qualified immunity, the plaintiff has the heavy burden of establishing: (1) that the defendant's actions violated a federal constitutional or statutory right; and (2) that the right violated was clearly established at the time of the defendant's actions.

*Scott v. Hern*, 216 F.3d 897, 910 (10th Cir. 2000)(quotations omitted); *Christensen v. Park City Mun. Corp.*, 554 F.3d 1271, 1278 (10th Cir. 2009). Defendants contend that no constitutional violation occurred.

As fully discussed next herein, Plaintiff has failed to demonstrate that Defendants violated either Fifth or Eighth Amendment principles applicable under the Fourteenth Amendment, or any other clearly established right. Accordingly, the court holds that Defendants are entitled to qualified immunity.

### B. Excessive Segregation Claim

Plaintiff was housed in ad seg at EDCF for 4 years, and alleges that it was under extreme conditions without notice and hearings, without justification, and with no meaningful review. He thus asserts that Defendants violated his due process rights under the Fourteenth Amendment.

"The Fourteenth Amendment provides that no state shall

'deprive any person of life, liberty, or property, without due process of law." *Estate of DiMarco v. Wyoming Dept. of Corrections*, 473 F.3d 1334, 1339 (10th Cir. 2007)(quoting U.S. Const. Amend. XIV). "A due process claim under the Fourteenth Amendment can only be maintained where there exists a constitutionally cognizable liberty or property interest with which the state has interfered." *Steffey v. Orman*, 461 F.3d 1218, 1221 (10th Cir. 2006)(citation omitted).

## 1. Due Process—Liberty Interest

Inmates are not entitled to a particular degree of liberty in prison, so ordinarily a change in an inmate's prison classification does not deprive him of any liberty interest. *Hewitt v. Helms*, 459 U.S. 460, 468 (1983)(finding "the transfer of an inmate to less amenable and more restrictive quarters for nonpunitive reasons is well within the terms of confinement ordinarily contemplated by a prison sentence."); *Templeman v. Gunter*, 16 F.3d 367, 369 (10th Cir. 1994); *Bailey v. Shillinger*, 828 F.2d 651, 652 (10th Cir. 1987). Only where state law creates a liberty interest in remaining free from segregation does placement in ad seg implicate due process. *Hewitt*, 459 U.S. at 468–69. The Kansas regulations do not create a protected liberty interest. *Dotson v. Maschner*, 764 F.Supp. 163 (D.Kan. 1991); *see also Abbott v. McCotter*, 13 F.3d 1439 (10th

Cir. 1994).  A decision by a prison official to place an inmate in ad seg does not implicate the Due Process Clause of the Fourteenth Amendment unless the confinement presents "the type of atypical, significant deprivation in which a state might conceivably create a liberty interest." *Sandin v. Conner*, 515 U.S. 472, 484 (1995); *Penrod v. Zavaras*, 94 F.3d 1399, 1406 (10th Cir. 1996)(same); *Talley v. Hesse*, 91 F.3d 1411, 1413 (10th Cir. 1996).

"[E]xtreme conditions in administrative segregation do not, on their own, constitute 'atypical and significant hardship' when compared to the 'ordinary incidents of prison life,'" or violate due process rights.  *Rezaq v. Nalley*, 677 F.3d 1001, 1013 (10th Cir. 2012).  But an extended confinement in ad seg can, of itself, constitute an atypical and significant hardship.  *See Payne v. Friel*, 266 Fed.Appx. 724, 728 (10th Cir.) (unpublished)[12], *cert. denied*, 555 U.S. 841 (2008)(citing *Perkins v. Kan. Dep't of Corrs.*, 165 F.3d 803, 806 (10th Cir. 1999). The Tenth Circuit has not established a bright-line test stating that a particular length of confinement necessarily creates that hardship.  It has held that a five-year period of administrative segregation did not amount to an atypical, significant hardship, given the legitimate penological interest of investigating the inmate's involvement in a prison murder. *Jordan v. Fed. Bureau*

_____

[12]   Unpublished opinions are cited herein not as binding precedent but for persuasive reasoning.  See Fed.R.App.P. 32.1 and 10th Cir.R. 32.1.

*of Prisons*, 191 Fed.Appx. 639, 652 (10th Cir. 2006) (unpublished), *cert. denied*, 550 U.S. 970 (2007). But it has also signaled that lesser durations of ad seg may be atypical. *See e.g., Fogle v. Pierson*, 435 F.3d 1252, 1259 (10th Cir. 2006), *cert. denied*, 550 U.S. 953 (2007)(finding three-year period of administrative segregation during which the inmate was confined to his cell for all but five hours each week and was denied access to any outdoor recreation was arguably "atypical"); *Trujillo v. Williams*, 465 F.3d 1210, 1225 (10th Cir. 2006)(finding 750 days in segregation "may itself be atypical and significant.").

The Tenth Circuit has focused on four factors when determining whether placement in administrative segregation implicates a protected liberty interest:

> (1) whether "the segregation relates to and furthers a legitimate penological interest, such as safety or rehabilitation; (2) [whether] the conditions of placement are extreme; (3) [whether] the placement increases the duration of confinement . . . ; and (4) [whether] the placement is indeterminate.

*Estate of DiMarco*, 473 F.3d at 1342. These factors are "not necessarily dispositive." Rather, "the proper approach is a fact-driven assessment that accounts for the totality of conditions presented by a given inmate's sentence and confinement." *Rezaq,* 677 F.3d at 1012. Any assessment must be "mindful of the primary management role of prison officials who

should be free from second-guessing or micro-management from the federal courts." *Id*. at 1014 (citing *DiMarco*, 473 F.3d at 1342).

In this case, all four factors weigh against an enforceable liberty interest. First, the facts indicate that Plaintiff is serving time for multiple offenses, has a criminal history including escape and absconding from parole, and had previously been on ISP and completed the IMU before he received a serious DR that violated his ISP and led to his placement in ad seg.[13] One week later, he received another DR, and prison officials referred to the misconduct reports in classifying Plaintiff as a security risk. Plaintiff was held in ad seg for nearly four years after his lewd act DR. However, prison officials made it clear they believed that Plaintiff's retention in ad seg was "necessary to preserve the safety and security of the (EDCF)." Doc. 6-1 at 11, 36. In December 2009 Plaintiff received another serious DR, which was noted on that month's review. Once Mr. Jones began attending seg reviews, communicating well with

---

[13]    Plaintiff does not show that prison officials acted improperly by considering available information as to his criminal background and prison misconduct described in DRs that were overturned for reasons other than lack of evidence in determining his security status and segregation placement. "[W]here administrative segregation results from an essentially predictive determination based upon the inmate's record that the inmate is a threat to the security of the institution, it is not necessary to provide the inmate with a summary of the evidence relied on" as it is in proceedings finding guilt.    The decision to segregate may be made upon "the administration's predictive judgment." *Jones v. Marquez*, 526 F.Supp. 871, 881 (D.Kan. 1981). Defendants have presented a sufficient administrative record to show that prison officials acted on a rational basis.

staff, and demonstrated his ability to remain DR free for a significant time, he was allowed to transition with a group back into general population. Preserving or promoting security by use of administrative segregation is a legitimate goal for prison officials. Defendants have met their burden to show a reasonable relationship between Plaintiff's extended segregation and the KDOC's asserted penological interests. *See Rezaq*, 677 F.3d at 1014.

Secondly, the conditions of Plaintiff's confinement, even if harsh, are not shown to have been extreme or atypical. Plaintiff alleges that he was strip-searched going to and from the yard; his weekly yard included 4 days outside, 1 day inside, and 2 days of no yard, while gen pop inmates received yard all 7 days; he was not allowed to take his leg brace and inhaler to the yard; the yard got no direct contact with sun; the yard did not have 2 basketball cages;[14] he was allowed to take only a little cup of liquid soap to the shower and no wash cloth, while gen pop inmates could take their own soap, shampoo and

---

[14] Plaintiff asserts that some of these conditions violated a "tentative" federal court order and "fed mandate of agreement." He exhibits (Doc. 6-1 at 42-49) pages from "Defendants' Supplement to the Long Term Plan for Administrative Segregation" that was filed in *Porter v. Graves*, Case No. 77-3045-RDR (April 5, 1996) and another unidentified document requiring that ad seg inmates at the EDCF be issued gloves, hooded sweatshirts, and hats from October 1st through April 30th for use during the exercise period; installation of basketball goals; portions of yard "open to the sun;" and indoor yard floor space of 350 square feet among other elements. Plaintiff's references to bits of this 27-year-old settlement agreement do not establish that conditions he experienced in ad seg in 2009-2011 were extreme, atypical, or otherwise unconstitutional.

washcloth; he was allowed only 3 showers a week on a 10-minute timer, while gen pop inmates were allowed showers 7 days a week with no time limit; the chaplain denied his June 2010 request to be baptized and for congregational activity while in ad seg;[15] he was on lock-down for 23 hours a day; a light was on in his cell for 24 hours a day; and he was indigent because there was no opportunity for employment. Any of these conditions standing alone is not sufficient to create a liberty interest, and taken together they do not impose an atypical and significant hardship within the correctional context, particularly within ad seg units. *See Wilkinson v. Austin*, 545 U.S. 209, 224 (2005)(conditions of 24-hour lighting and one-hour daily exercise in a small indoor room likely to apply to most solitary confinement facilities and thus not atypical); *Rezaq*, 677 F.3d at 1015 (Conditions at ADX including 23-hour lock-down "comparable to those routinely imposed in the administrative segregation setting."). Plaintiff's comparisons to conditions in gen pop do not establish that conditions in the EDCF ad seg

---

[15] These allegations are not asserted as a claim under the First Amendment's Free Exercise of Religion Clause, and sufficient facts are not alleged by Plaintiff so as to support such a claim or permit this court to assert this cause of action for him. Plaintiff alleges no facts showing that the chaplain's denial significantly inhibited Plaintiff's religious conduct or expression, or meaningfully curtailed Plaintiff's ability to express adherence to his faith, or denied Plaintiff a reasonable opportunity to engage in fundamental religious activities. *Sayed v. Profitt*, 415 Fed.Appx. 946, 948 (10th Cir.), *cert. denied*, 132 S.Ct. 142 (2011); *Wares v. Simmons*, 524 F.Supp.2d 1313, 1319 (D.Kan. Oct. 31, 2007). Even if access to baptism and congregational activities was more limited than for persons in gen pop, this does not amount to an atypical or significant hardship that would implicate a liberty interest under the Due Process Clause.

were significantly different from conditions routinely imposed on inmates with backgrounds similar to his serving comparable sentences.

Plaintiff claims that the routine strip searches could be viewed by opposite-sex officers and nurses through a big window; while in gen pop, strip searches were random and private. However, he does not allege that he was ever actually viewed inappropriately during a strip search. His own exhibits include a contrary statement by Warden Roberts that strip search cells used in EDCF segregation "were actually designed to ensure privacy of searches prior to taking inmates to the segregation yards," and their "design is comparable to others in the KDOC and does not present significant privacy issues." (Doc. 6-1 at 114).

Plaintiff complains that the outside yard was "constantly filled" with bird feces and dead baby birds, that the cages "hardly" got cleaned, and that inmates threw feces and urine at each other, which was allowed "to fester" in the un-cleaned cages so that when it rained, the backs of cages flooded and inmates had to wade in feces and urine. While these statements evoke an undeniably harsh scene, Plaintiff alleges no facts regarding the dates, frequency, or duration of his actual exposure to this scenario or of rainy days during his weekly 4 hours on the yard. Defendants, on the other hand specify that

ad seg conditions are controlled by the uniform policies and procedures adopted by EDCF General Order 10-102 (Management of Inmates Housed on Segregation Status)(Doc. 22-10), and the Living Unit Rules (Doc. 22-11 at 1-9). They also present the affidavit of Timothy Rand (Doc. 22-11 at 10-14) who avers that he is the "current segregation Lieutenant" at the EDCF. These documents show that crews were scheduled to clean the yard and cages weekly to alleviate the bird droppings problem and that inmates are disciplined for throwing body fluids on the yard. Plaintiff's general denial in response that Rand is not the seg lieutenant and bald statement that ad seg conditions were "really restrictive" during his stay do not amount to specific facts showing a genuine issue for trial. Rand further states that Plaintiff was not treated differently than any other inmate in ad seg.

Plaintiff alleges that he had to wear rubber, open-toed clogs to the yard and was not issued gloves, a hat, or a sweatshirt with a drawstring, while gen pop inmates wore tennis shoes or boots. He further alleges that as a result during extremely cold winter weather he was unable to touch the metal workout chair in the yard and his feet were "so frozen" that upon return to his cell and an immediate hot shower, he had intense pain in his toes and fingers. Again, Plaintiff does not provide dates or facts indicating the time, frequency, or

duration of his personal exposure to freezing weather on the yard. Lieutenant Rand's affidavit indicates that ad seg inmates participating in outdoor yard are required to wear a two-piece outfit or jumpsuit, socks and krocs, and in winter are allowed to wear a hoodie and, upon request, a winter coat.

Plaintiff also complains that access to the intercom in his cell was limited in that it could be used to summon an officer but neither the inmate nor the officer could talk over it. However, Plaintiff stated in his grievance (Doc. 6-1 at 86) that when an inmate presses the intercom button "usually what occurs is the officer turns on the inmate's in cell telephone." Moreover, while he claims that this is a life threatening situation for an inmate who is unresponsive, he does not allege that he ever became unnresponsive or was harmed as a result of this system.

Plaintiff's allegations that he suffered "the symptoms" and negative effects associated with prolonged isolation and that MH provided no programs to effectively deal with the extreme conditions were previously dismissed for failure to allege sufficient facts to support an Eight Amendment claim of denial of medical treatment.[16] Conclusory claims are likewise not sufficient to show that conditions were atypical and extreme.

---

[16] Plaintiff's exhibit, Doc. 6-1 at 62 supports the court's previous finding that his complaints in this regard were mere disagreements with the attention that was provided by MH.

The court concludes that Plaintiff's allegations fail to raise a material question of fact that the conditions Plaintiff actually endured in administrative segregation were atypical or extreme. *See Jordan*, 191 Fed.Appx. at 653 (citing *Duarte v. Henman*, 986 F.2d 1427, 1992 WL 403128, at *1 (10th Cir. Dec. 29, 1992, Table.)); *Schmitt v. Rice*, No. 08-3047-SAC, 2010 WL 3775526, at *4 (D.Kan., Sept. 21, 2010), *aff'd*, 421 Fed.Appx. 858 (10th Cir. 2011); *see generally Rhodes*, 452 U.S. 337, 347 (1981) (stating "restrictive and even harsh [conditions] are part of the penalty that criminal offenders pay for their offenses against society.").

As to the third *DiMarco* factor, Plaintiff has not alleged that his placement in ad seg increased the duration of his confinement. Nor does he show that his parole eligible date was affected by his confinement in ad seg.

Finally, while Plaintiff's placement in ad seg may have seemed indeterminate at times to him and continued for over 4 years, duration alone is not the focus of indeterminacy. *Rezaq*, 677 F.3d at 1016. Indeterminacy primarily focuses on the frequency and meaningfulness of the reviews of Plaintiff's status. *See Wilkinson*, 545 U.S. at 211 (finding solitary confinement to be indefinite because the placement was reviewed only annually, after the initial 30-day review,); Cf. *DiMarco*, 472 F.3d at 1343-44 (finding confinement not indefinite where

27

inmate had regular reviews every 90 days). The Tenth Circuit has found that "[t]he availability of periodic reviews merely suggests that the confinement was not indefinite." *Rezaq*, 677 F.3d at 1016 (finding placement in ad seg not indefinite where inmate had reviews twice a year, despite inmate's placement there for almost thirteen years).

The record clearly reflects that prison officials at the EDCF regularly reevaluated Plaintiff's placement in ad seg by conducting monthly reviews. This periodic review process provided adequate procedural protections to Mr. Jones, including the opportunity to speak and participate, written recommendations and reasons of a three-member segregation review board, and written decisions by members of the program management committee. No allegation is made that Plaintiff proffered any evidence that was refused or that any member of the SRB or the PMC was not impartial. Plaintiff chose not to participate in many of the SRB reviews despite being told repeatedly that he should attend and work toward necessary goals. In sum, Mr. Jones alleges no facts establishing that the reviews themselves were substantively perfunctory or meaningless. *Cf. Toevs v. Reid*, 685 F.3d 903, 907 (10th Cir. 2012)(finding Constitution requires meaningful periodic reviews during an inmate's placement in ad seg in a stratified incentive program because its sole stated purpose was to encourage inmate

28

to improve his future behavior); *Hewitt*, 459 U.S. at 460.

Plaintiff's allegations and objections that Defendants' motion is supported by "documents" that were "dismissed, dropped or overturned" and "void" DRs indicate his belief that he could not be held in ad seg based upon his lewd act DR conviction because it was eventually dismissed due to a procedural irregularity. However, Plaintiff overlooks that this disciplinary conviction remained valid until it was actually overturned by the court, which was not until October 2010. Furthermore, even after a disciplinary case has been dismissed, if prison officials continue to believe that an inmate poses a risk to staff or security, the inmate's status may be changed to "pending investigation" or "Other Security Risk." *Robinson v. Roberts*, 2009 WL 539924 (D.Kan. Mar. 4, 2009); *Hewitt*, 459 U.S. at 474 (An inmate who has properly avoided punishment for engaging in prohibited activity may still be deemed a security risk and placed in ad seg.). Moreover, multiple other reasons were provided for Plaintiff's continued secure classification.

Plaintiff objects that reviews were not meaningful because various reasons were provided for his placement and retention in ad seg and complains that he never knew why he was being retained. Mr. Jones was initially placed on PHD status based on his first DR, he was classified OSR and continued in ad seg based on his lewd acts DR, and he was informed early in 2009

told that he was being retained for reasons other than those underlying his initial placement. He claims that this violated his due process right to meaningful review and amounted to fraud and deceit as to the reasons he was being held. The record shows to the contrary that throughout the course of his segregation, Plaintiff was provided with legitimate reasons for his continued security status and given advice to allow him to work his way out of segregation. Mr. Jones was reminded of his long history of recalcitrant behavior and advised that he needed to remain DR free for at least one year. He was also advised that he needed to work with MH and the unit team, that he should establish goals and develop a long term plan for successful transition to gen pop, and that he needed to attend his ad seg reviews. He was further advised that his release was subject to an interview with Warden Roberts and that his failure to candidly discuss his background involving escape or escape attempts at interviews was a factor in his continued segregation.[17]

The court need not "closely review the process at this stage." *Rezaq*, 677 F.3d at 1016 (citing *DiMarco*, 473 F.3d at 1343)(concluding that confinement was not indefinite where prisoner had reevaluations every ninety days and had the

---

[17]   Plaintiff "objects" to all Defendants' seg review exhibits in general and to Warden Roberts' affidavit in particular, claiming they contain erroneous information because he never received a DR or new charge or hearing on the 2000 attempted escape. However, he does not produce specific material facts that controvert Defendants' exhibits or invalidate their consideration of this background information.

opportunity to be heard at the meetings). Nevertheless, because of the extended time that Plaintiff was retained in ad seg, the court has carefully considered the ad seg reviews and has no difficulty concluding that meaningful review was frequently and regularly provided to Mr. Jones. This factor weighs against finding a liberty interest.

The court finds from the foregoing that Plaintiff has failed to raise a material question of fact that his long-term confinement in ad seg at the EDCF created a liberty interest. Therefore, "no particular process was constitutionally due or required." *Templemen*, 16 F.3d at 371.

### 2. Sufficient Procedural Protections

In addition to demonstrating a protected interest, Plaintiff must show that he was deprived of that interest without due process. Even if Plaintiff's long confinement in ad seg gave rise to a protected liberty interest, the facts do not suggest that Plaintiff was denied due process. *See Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). "Prisoners held in lawful confinement have their liberty interests curtailed by definition, so the procedural protections to which they are entitled are more limited than in cases where the right at stake is the right to be free from confinement at all." *Wilkinson*, 545 U.S. at 225. Due process is satisfied if Plaintiff

received: (1) a sufficient initial level of process, i.e., a reasoned examination of the assignment; (2) the opportunity to receive notice of and respond to the decision; and (3) safety and security concerns are weighed as part of the placement decision. *DiMarco*, 473 F.3d at 1344 (citing *Wilkinson*, 545 U.S. at 226-27)); *Jordan*, 191 Fed.Appx. at 653 n. 11 (and cases cited therein); *Jones v. Fields*, 104 F.3d 367, *2 (10th Cir. 1996)(unpublished)("Administrative segregation due to legitimate concerns about [the inmate's] escape history and prison security did not impose an atypical and significant hardship . . . in relation to the ordinary incidents of prison life.").

The foregoing discussion regarding the periodic reviews provided to Plaintiff and the stated reasons for Plaintiff's continued placement in ad seg demonstrate that each of these elements is satisfied, and that Plaintiff received, as a matter of law, all the process that was due him.[18]

### C. Eighth Amendment—Cruel and Unusual Punishment Claim

Plaintiff also asserts that his continued placement in ad seg violated the Eighth Amendment. Prison officials violate the

_____

[18] Plaintiff's claim that on April 21, 2009, the reasons for his confinement in ad seg were changed without a hearing does not amount to specific facts showing a genuine issue for trial. This claim is apparently based on a grievance response he received indicating that Defendant Gibreal had considered his history of involvement in escape and escape attempts. Plaintiff does not show that this amounted to a significant or improper change in the reasons for his segregation. Nor does he show that he was entitled to process beyond his regular reviews and the responses to his grievance and administrative appeal.

Eighth Amendment when two conditions are met: the deprivation alleged is sufficiently serious, i.e., the official's act or omission resulted in denial of "minimal civilized measure of life's necessities," *Meriwether v. Faulkner*, 821 F.2d 408, 416 (7th Cir.), *cert. denied*, 484 U.S. 935 (1987)(quoting *Rhodes*, 452 U.S. at 347), and the officials acted with deliberate indifference, i.e., he or she knew of and disregarded excessive risk to the inmate's health and safety. The Eighth Amendment "does not mandate comfortable prisons," but requires prison officials to "provide humane conditions of confinement;" to "ensure that inmates receive adequate food, clothing, shelter, and medical care;" and to "take reasonable measures to guarantee the safety of the inmates." *Farmer v. Brennan*, 511 U.S. 825, 832-833 (1994)(quoting *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984).

Even construing Plaintiff's complaint liberally and viewing the record in the light most favorable to him, the Court finds that his allegations do not come within the purview of the Eighth Amendment's prohibition against cruel and unusual punishment. Those limitations and other conditions that are adequately described by Plaintiff are of the type that normally accompany confinement in ad seg. No facts suggest that they deprived Mr. Jones of life's necessities. *See Perkins*, 165 F.3d at 809. Nor does the record reflect Defendants' deliberate

indifference to a sufficiently serious risk to plaintiff's health or safety. *See Ajaj v. United States*, 293 Fed.Appx. 575, 582–84 (10th Cir. 2008), *cert. denied*, 1129 S.Ct. 1600 (2009)(finding conditions including "lockdown 23 hours per day in extreme isolation," a light that remained on 24 hours a day, and "limited ability to exercise outdoors" did not, individually or in concert, amount to an 8th Amendment violation). Moreover, there is no indication in the facts that either Defendant knowingly provided constitutionally inadequate conditions in ad seg, or was directly responsible for such conditions.[19]

Furthermore, Plaintiff does not identify any physical injury he suffered as a result of the alleged conditions. He claims he suffered migraines but has not established a connection between this ailment and ad seg conditions. A 1983 claim "cannot stand . . . unless the plaintiff has suffered a physical injury in addition to mental or emotional harms." *Wallin v. Dycus*, 381 Fed.Appx. 819, 824 (10th Cir. 2010)(unpublished)(citations omitted.), *cert. denied*, 132 S.Ct. 171 (2011). Summary judgment on this claim is warranted.

Plaintiff has not established the existence of a genuine

---

[19]     On October 25, 2010, Plaintiff filed a grievance claiming conditions in the EDCF ad seg amounted to "atypical and significant hardship in relation to the ordinary incident of prison life." Doc. 6-1 at 76. He now alleges that Defendants received notice of these conditions through this grievance and did nothing to change them. He claims that by denying this grievance, Defendants actively participated or acquiesced in "their subordinate's decision." It is well settled that personal participation is not shown by mere affirmance of an administrative grievance.

issue of material fact regarding Defendants' violation of his Fifth Amendment, Eighth Amendment, or any other federal rights. Defendants are thus entitled to qualified immunity from this suit. Having found no genuine issue of material fact exists for a jury determination, the court concludes that summary judgment is an appropriate means of resolving Mr. Jones' civil rights complaint.

**IT IS THEREFORE ORDERED** that Plaintiff's Motion for Default Judgment (Doc. 32) is denied; Defendants' Motion to Stay Discovery (Doc. 29) is dismissed as moot; and Defendants' Motion for Summary Judgment (Doc. 25) is granted on all claims.

**IT IS FURTHER ORDERED** that this case is dismissed and all relief is denied with prejudice.

**IT IS SO ORDERED.**

Dated this 27th day of March, 2013, at Topeka, Kansas.

s/Sam A. Crow
U. S. Senior District Judge